## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**MAXINE DENISE JOHNSON,**

    **Plaintiff,**

    **v.**

**ANDREW SAUL,**
**COMMISSIONER OF SOCIAL**
**SECURITY,**

    **Defendant.**

**No. 1:19-cv-02-DLF-ZMF**

### REPORT AND RECOMMENDATION

Plaintiff, Maxine Denise Johnson, moves to reverse a decision by the Commissioner of the Social Security Administration ("SSA") adopting the findings of an Administrative Law Judge ("ALJ") and denying Ms. Johnson's application for Supplemental Security Income ("SSI"). *See* ECF No. 18 (Pl.'s Mot. J. Reversal) at 1. Ms. Johnson claims that the ALJ committed reversible error at steps three, four, and five in the five-step process used by the SSA to determine whether a claimant is disabled. *See* 20 C.F.R. § 416.920(a)(4); Pl.'s Mot. J. Reversal at 5, 10, 13.

On April 11, 2019, United States District Judge Dabney L. Friedrich referred this matter to a magistrate judge for full case management, including the preparation of a Report and Recommendation pursuant to Local Civil Rule 72.3. *See* Minute Order (Apr. 11, 2019). Pending before this Court are Ms. Johnson's Motion for Judgment of Reversal and the Defendant Social Security Commissioner's Motion for Judgment of Affirmance. *See* Pl.'s Mot. J. Reversal; ECF No. 19 (Def.'s Mot. J. Affirmance). Having considered the parties' submissions and the

Administrative Record,[1] and for the reasons set forth below, the undersigned recommends that the Court DENY Plaintiff's Motion for Judgment of Reversal, and GRANT Defendant's Motion for Judgment of Affirmance.

## I.    BACKGROUND

### A.    Statutory Framework

The Social Security Act entitles an individual to disability benefits if she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. § 416.905(a) (2020).  The impairment must be severe and must render the individual unable to perform both "previous work" and "any other kind of substantial gainful work which exists in the national economy."  § 1382c(a)(3)(B); 20 C.F.R. § 416.905 (2020).

The SSA uses a five-step process to determine whether a claimant is disabled.  *See* 20 C.F.R. § 416.920(a)(4).  The claimant bears the burden at the first four steps.  *See*, *e.g.*, *Butler v. Barnhart*, 353 F.3d 992, 997 (D.C. Cir. 2004).  First, a claimant must show that she is not presently engaged in "substantial gainful activity."  § 416.920(a)(4)(i).  Second, she must demonstrate that she has a "severe impairment" that "significantly limits [her] physical or mental ability to do basic work activities."  §§ 416.920(a)(4)(ii), 416.920(c).  Third, the ALJ must determine if the claimant's impairments or combination of impairments "meets or equals" one of the listings at 20 C.F.R. Part 404, Subpart P, Appendix 1.  *See* § 416.920(a)(4)(iii).  If it does, then the claimant is deemed disabled and the inquiry ends.  *Id.*  If not, the ALJ must proceed to the fourth step, which

---

[1] The Administrative Record consists of nine exhibits attached to ECF Number 12.  For ease of reference, citations to the Administrative Record will refer to the "AR" and cite to the consecutive page numbers provided in the lower right-hand corner of each page.

requires the ALJ to determine the claimant's residual functional capacity (RFC) and consider whether, in light of the RFC, the claimant can still perform any past work. *See* § 416.920(a)(4)(iv). Fifth, if the RFC indicates the claimant cannot engage in past work, then the burden shifts to the Commissioner to prove that the claimant's RFC, age, education, and past work experience indicate that she is able to perform "other work" that exists in the national economy. § 416.920(a)(4)(v); *Butler*, 353 F.3d at 997.

      B.    <u>Factual Background</u>

          1.    *Ms. Johnson's and Third Party's Testimony and Reports*

Ms. Johnson has worked as an oyster shucker (1997–99) and as a dishwasher (2005–06). *See* AR 108, 269. At the time of the administrative hearing, she did not have a driver's license and lived in a home with her eighty-four-year-old mother and twenty-eight-year-old daughter. *See* AR 106–07, 122. She testified at the hearing and in her adult function reports that she cared for her personal needs, including dressing, bathing, caring for hair, shaving, feeding herself, and using the toilet, but sometimes needed help from her family because she got dizzy. *See* AR 122, 293, 322. She reported that she prepared meals, did simple chores, used public transportation, and shopped in stores for food and clothes at least twice a month. *See* AR 294–95, 323–24. She stated that she handled money, including paying bills, counting change, handling a savings account, and using a checkbook and money orders. *See* AR 324. She said she read the newspaper, watched television, and walked around the neighborhood or park almost every day. *See* AR 123–24, 296, 325. She also reported that she attended church twice a week, socialized with family and friends, and went to doctor's appointments. *See id.* She testified that she got a cane in 2017 and could walk around a quarter of a block before needing to stop and rest. *See* AR 118. She alleged that she could not lift over five pounds. *See* AR 119.

Eddie Curtis, with whom Ms. Johnson was in a romantic relationship, filed a third-party adult function report in the SSA proceedings.  *See* AR 301–09.  Mr. Curtis testified that Ms. Johnson took care of her personal needs.  *See* AR 303.  He wrote that Ms. Johnson handled daily simple meal-preparation and housekeeping work.  *See* AR 304.  He testified that Ms. Johnson went outside daily with company or independently.  *See* AR 305–06.  He reported that she walked to the park and through the neighborhood, used public transportation, and shopped in stores.  *See id.* He further stated that Ms. Johnson could lift "10 or less pounds," walk "3/4 of a block" before needing to stop and rest, pay attention for "5–10 minutes," follow instructions "with assistance," and that she did not handle changes in routine well, "but will adjust."  AR 307–08.  He did not indicate that Ms. Johnson walked with a cane.  *See* AR 308.

2.     *Medical Evidence*

Doctors amputated Ms. Johnson's left finger in 2005, nine years before her SSI filing date. *See* AR 853.  Two primary care doctors, Dr. Edwin Williams, M.D., and Dr. Melvin Gerald, M.D, treated Ms. Johnson.  She attended routine primary care visits approximately every four months for various complaints, including a head injury and memory loss, pain and numbness in her left hand, headaches, depression, balance problems, dizziness, bronchitis, and sleep problems.  *See* AR 357–96, 541–65, 763–810, 832–34, 930–41.

On June 30, 2014, doctors diagnosed her with dizziness and giddiness and vertigo disorder. *See* AR 386, 799.  On July 15, 2014, she underwent an MRI scan that showed no significant neurological abnormalities.  *See* AR 395, 403.

On May 18, 2015, Ms. Johnson consulted with Dr. Katherine Marshall Woods, a psychologist.  Dr. Woods concluded that Ms. Johnson "exhibited no limitations in her ability to maintain a regular schedule;" that she was "mildly impaired in her ability to follow and understand

simple directions and instructions, perform simple tasks independently, maintain attention and concentration, learn new tasks, and relate adequately with others;" and that she was "moderately limited in her ability to perform complex tasks independently, make appropriate decisions, and appropriately deal with stress." AR 531–32.

On August 21, 2015, Dr. Elizabeth Nolte, M.D., examined Plaintiff and concluded that she "ha[d] mild limitation in pushing . . . standing, walking, handling and grasping." AR 539. On August 24, 2015, State Agency Psychological Consultant Nancy Heiser, Ph.D., determined that Ms. Johnson's mental impairments did not meet or medically equal any listed impairment at 20 C.F.R. Part 404, Subpart P, Appendix 1. *See* AR 146.

On September 1, 2015, state agency physician Veronica Bedeau evaluated Plaintiff's RFC. *See* AR 147–48. She found that Ms. Johnson could frequently lift and/or carry up to ten pounds, and in an eight-hour workday could stand and/or walk for about six hours and sit for a total of about six hours. *See id.* Her ability to push and/or pull was unlimited; neither did she have postural, manipulative, visual, communicative, or environmental limitations. *See id.* Dr. Bedeau indicated that Ms. Johnson "[wa]s capable of a light RFC" and that she "c[ould] perform handling and gross manipulations without difficulties." AR 148.

On September 30, 2015, state agency disability examiner Sureta M. Butler concluded that Ms. Johnson was "[n]ot [d]isabled," and that "[her] condition [wa]s not severe enough to keep [her] from working." AR 151. Based on the relevant file, the examiner determined that Ms. Johnson "c[ould] adjust to other work." AR 151–52.

On December 11, 2015, Dr. Williams prescribed a walking cane at Plaintiff's request because she "[felt] like her balance [was] off." AR 541. No further explanation accompanied this

prescription.  *See id.*  On December 15, 2015, Plaintiff received a CT scan of the brain that showed no abnormalities.  *See* AR 585.

Ms. Johnson consulted Dr. Janaki Kalyanam on January 14 and February 8, 2016, for numbness in both hands.  *See* AR 589-95.  Cervical spine x-rays showed "[n]o evidence of acute fracture or subluxation."  AR 589.  The testing did reveal "[m]ild multilevel cervical spondylosis distended from C4 through C7," which is a common age-related condition that is asymptomatic. *Id.*

On March 10, 2016, Plaintiff met again with Dr. Woods, who concluded that Plaintiff "exhibit[ed] no limitations in her ability to follow and understand simple directions and instructions, perform simple tasks independently, and maintain attention and concentration;" that she was "mildly limited in her ability to learn new tasks;" and that she was "moderately limited in her ability to maintain a regular schedule, perform complex tasks independently, make appropriate decisions, relate adequately with others, and appropriately deal with stress."  AR 602.  Dr. Nolte further noted that Plaintiff's "[c]ervical spine show[ed] full flexion, extension."  AR 609.  X-rays of her left hand and shoulder were normal, and Dr. Woods concluded that Ms. Johnson "ha[d] mild limitation in bending, pushing, grasping, and handling."  AR 610.

On March 24, 2016, state agency physician Dr. Walter Goo determined that Ms. Johnson could frequently lift and/or carry up to ten pounds, stand and sit for about six hours in an eight-hour workday, perform unlimited pushing and/or pulling, climb ramps/stairs frequently, climb ladders/ropes/scaffolds frequently, stoop, kneel, crouch, and crawl frequently, perform frequent manipulative movements with her left hand, and perform fine manipulation with her fingers.  *See* AR 166–67.  Overall, Dr. Goo concluded that Plaintiff "retain[ed] the capacity for light work." AR 167.

On July 28, 2016, Dr. Marc Cottrell, a psychologist, diagnosed Plaintiff with Major Depressive Disorder and PTSD.  *See* AR 22, 757.  In a check-box evaluation, Dr. Cottrell indicated that Ms. Johnson had marked limitations in her ability to "make simple work-related decisions," "maintain attention and concentration for extended periods," "understand, remember and carry out complex instructions," and perform "her daily activities."  AR 22–23, 755–56.

On August 5, 2016, Dr. Williams checked "yes" without any explanation in a physical capacities evaluation to the question, "does this patient require an assistive device . . . to ambulate even minimally in a normal workday."  AR 760.  On August 26, 2017, Dr. Gerald diagnosed Plaintiff with dizziness and giddiness.  *See* AR 933–34.  Neither Dr. Williams nor Dr. Gerald noted in any treatment record that the cane was medically necessary or that Plaintiff had any gait or ambulation abnormalities.  *See* AR 357–96, 541–65, 763–810, 832–34, 930–41.

From 2013 to 2017, Drs. Williams and Gerald recorded normal examination findings.  *See* AR 357–96, 541–65, 763–810, 832–34, 930–41.  They reported that Plaintiff was pleasant, alert, oriented, and in no acute distress, with an appropriate mood and affect.  *See id.*  Her neurological examinations revealed intact cranial nerves, no lack of muscle control or coordination of voluntary movements, and a normal gait and station.  *See id.*  Her musculoskeletal system was intact with a full range of motion, no back or bone pain, no bony back tenderness, and no arthritis.  *See id.*

Ms. Johnson was never hospitalized for psychiatric issues.  She had routine outpatient mental health treatment, including individual therapy and medication management.  *See* AR 504–21, 619–45, 837–926, 943–74.  From July 2014 to November 2015, Plaintiff saw Dr. Tejpal Singh for complaints of depression and anxiety.  *See* 504–21, 619–45.  She denied medication-related side effects and reported improvement in her mood symptoms and anxiety with medication.  *See*

AR 506–20.   She also received therapy at the D.C. Department of Behavioral Health and Preventive Measures.   *See* AR 812–20, 835–926, 942–74.

C.   Procedural Background

On December 31, 2014, Ms. Johnson filed an application for SSI, alleging disability beginning December 1, 2005.   *See* AR 11.   The claim was denied on October 1, 2015.   *See id.*   On April 14, 2016, the SSA denied her claim again upon reconsideration.   *See id.*   Ms. Johnson filed a request for a hearing, which the SSA held on February 15, 2018.   *See id.*

On June 27, 2018, ALJ M. Krasnow decided that Ms. Johnson was not disabled.   *See* AR 12, 26.   At step one, the ALJ found that Ms. Johnson had not engaged in substantial gainful activity.   *See* AR 13.   At step two, the ALJ found that Ms. Johnson had the severe impairments of "partial left index finger amputation, residual effects of partial amputation; left carpal tunnel syndrome; cervical spondylosis/degenerative disc disease with radiculopathy; osteoarthritis; obesity; major depressive disorder/depression; generalized anxiety disorder; posttraumatic stress disorder; alcohol use/abuse disorder; and borderline intellectual functioning."   *Id.*

At step three, the ALJ determined that Ms. Johnson "d[id] not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1."   AR 14.   Specifically, Ms. Johnson's mental impairments did not meet or medically equal the criteria of listings 12.02, 12.04, 12.05, 12.06, 12.11, and 12.15.   *See* AR 15.   The ALJ found that Ms. Johnson's mental impairments "d[id] not cause at least two 'marked' limitations or one 'extreme' limitation."   AR 17.   As such, neither the Paragraph B nor Paragraph C criteria was satisfied.   *See id.*

At step four, the ALJ found that Ms. Johnson had the RFC "to perform light work as defined   in   20   CFR   416.967(b)   except   no   more   than   frequent   climbing   of

ladders/ropes/scaffolds/ramps/stairs, balancing, stooping, kneeling, crouching, or crawling." AR 17. The ALJ also found that she was "limited to no more than frequent bilateral handling," and "no more than concentrated exposure to fumes, odors, dusts, gases and hazards (such as moving machinery and unprotected heights and parts)." *Id.* Further, she was "limited to simple, routine and repetitive tasks with no production rate for pace of work," and she was "limited to no more than occasional interaction with the general public or supervisors." *Id.* The ALJ also determined that Ms. Johnson had no past relevant work. *See* AR 24.

At step five, the ALJ determined that given Ms. Johnson's age (50 years old), education (completed 11th grade), work experience, and RFC, there were jobs in significant numbers in the national economy that she could perform. *See* AR 24. In reaching this conclusion, the ALJ relied on the testimony of impartial vocational expert ("VE"), Mary Everts. *See id.* The ALJ asked the VE to assume a hypothetical individual of Ms. Johnson's age and education who could "perform a full range of light work" with certain limitations.[2] AR 135. The VE responded that this hypothetical person could make a vocational adjustment to a significant number of light, unskilled jobs in the national economy, such as a sorter, a laundry worker, or an assembler. *See* AR 135–36. The VE testified, however, that the three identified jobs would be unavailable "[i]f the person required the use of a cane for ambulation." *Id.*

Ms. Johnson now seeks review of the ALJ's decision, arguing that the ALJ erred at steps three, four, and five. *See* Pl.'s Mot. J. Reversal at 5–19.

---

[2] These limitations included that the person could "frequently climb ramps and stairs; climb ropes, ladders, and scaffolds; balance; stoop; kneel; crouch; and crawl[; . . .] could [perform] frequent[] [bilateral handling] and must avoid concentrated exposure to fumes, odors, dusts, and gases as well as to hazards including dangerous machinery, unprotected heights, and parts[; . . .] further limited to simple routine competitive tasks with no production rate for pace of work and occasional interaction with the general public and with supervisors." AR 135

## II.   LEGAL STANDARD

"In a disability proceeding, the ALJ 'has the power and the duty to investigate fully all matters in issue, and to develop the comprehensive record required for a fair determination of disability.'" *Simms v. Sullivan*, 877 F.2d 1047, 1050 (D.C. Cir. 1989) (quoting *Diabo v. Sec'y of Health, Educ. & Welfare*, 627 F.2d 278, 281 (D.C. Cir. 1980)).  Upon review, "[t]he court must uphold the [ALJ's] determination if it is supported by substantial evidence and is not tainted by an error of law." *Smith v. Bowen,* 826 F.2d 1120, 1121 (D.C. Cir. 1987).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Butler*, 353 F.3d at 999 (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  This standard "requires more than a scintilla, but can be satisfied by something less than a preponderance of the evidence." *Fla. Mun. Power Agency v. FERC*, 315 F.3d 362, 365–66 (D.C. Cir. 2003) (cleaned up). "Substantial-evidence review is highly deferential to the agency fact-finder." *Rossello ex rel. Rossello v. Astrue*, 529 F.3d 1181, 1185 (D.C. Cir. 2008).  On review, the "plaintiff bears the burden of demonstrating that the Commissioner's decision [was] not based on substantial evidence or that incorrect legal standards were applied." *Settles v. Colvin*, 121 F. Supp. 3d 163, 169 (D.D.C. 2015) (quoting *Muldrow v. Astrue*, No. 11-1385, 2012 WL 2877697, at *6 (D.D.C. July 11, 2012)).

The reviewing court may not replace the ALJ's judgment "concerning the credibility of the evidence with its own." *Goodman v. Colvin*, 233 F. Supp. 3d 88, 104 (D.D.C. 2017).  Rather, "[t]he credibility determination is solely within the realm of the ALJ." *Grant v. Astrue*, 857 F. Supp. 2d 146, 156 (D.D.C. 2012).

**III.    ANALYSIS**

    A.    <u>Step-Three Evaluation of Anxiety Disorder Under § 12.06</u>

The medical criteria of the listings considered in step three "are more restrictive than the statutory disability standard" because they describe impairments that are "severe enough to prevent a person from doing any gainful activity," not just "substantial gainful activity." *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990) (quoting § 416.925(a)).  "For a claimant to show that h[er] impairment matches a listing, it must meet *all* of the specified medical criteria.  An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Zebley*, 493 U.S. at 530.

Anxiety disorders are covered under § 12.06.  Listing 12.06 has three paragraphs, designated A, B, and C. The claimant's mental disorder must satisfy the requirements of paragraphs A and B, or A and C.  *See* 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.06.  The ALJ determined that Ms. Johnson satisfied Paragraph A, but not Paragraphs B and C.  *See* AR 14–17.  Ms. Johnson only challenges the Paragraph C determination.  *See* Pl.'s Mot. J. Reversal at 7, 9.

Paragraph C requires the claimant's mental disorder to be "serious and persistent; that is, [she] ha[d] a medically documented history of the existence of the disorder over a period of at least 2 years." § 12.06(C) (internal quotation omitted).  The claimant must also show evidence of *both*: 1) "[m]edical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that [was] ongoing and that diminishe[d] the symptoms and signs of [her] mental disorder;" and 2) "[m]arginal adjustment, that is, [she] ha[d] minimal capacity to adapt to changes in [her] environment or to demands that [were] not already part of [her] daily life." *Id.*

1.   *Determining the Severity of Ms. Johnson's Mental Impairments*

The ALJ "specifically identifie[d] Listing [12.06], describe[d his] reasons for concluding that Plaintiff's condition d[id] not meet or medically equal that Listing, and [went] on to discuss the evidence in the record in significant detail." *Conway ex rel. Tolen v. Astrue*, 554 F. Supp. 2d 26, 34 (D.D.C. 2008). There was no requirement "that the ALJ provide an exhaustive point-by-point breakdown of each and every listed impairment. Rather, the ALJ [satisfied his obligation] to provide a coherent basis for his step-three determination." *Keene v. Berryhill*, 732 F. App'x 174, 177 (4th Cir. 2018).

*First*, the ALJ noted Plaintiff's relatively conservative psychiatric treatment history with no hospitalizations due to psychiatric reasons. *See* AR 16. From July 2014 to November 2015, she saw Dr. Singh around twenty times for complaints of depression and anxiety. *See* AR 504–20, 619–41. Dr. Singh reported Plaintiff was "well-groomed, neat, maintain[ed] eye contact;" she had ok mood, regular speech, good judgment, and intact thought process; she was oriented and had appropriate affect; she was cooperative, had normal awareness of her surroundings, normal psychomotor activity, and no perceptual disorder. *See id.* In addition, Ms. Johnson received outpatient mental health therapy at the D.C. Department of Behavioral Health and Preventive Measures. *See* AR 812–20, 835–926, 942–74. Her examiners similarly found her to be "neatly groomed . . . [and] oriented;" her "mood and affect was sad, cooperative, appropriate;" her "thoughts were circumstantial, congruent;" her "speech was normal, consistent with content;" she "denied presence of suicidal or homicidal ideation and/or intent;" she "denied the presence of any delusional thoughts and/or hallucinations; and she was "engaged and receptive to the proposed treatment interventions." AR 918. This lack of "evidence of any inpatient treatment, psychiatric hospitalizations, or anything in the record similar to an extended episode of decompensation"

demonstrated that Ms. Johnson's problems were insufficiently serious. *Page v. Colvin*, 2016 WL 9456343, at *11 (D.D.C. 2016).

*Second*, the ALJ "note[d] that, during her mental health treatment sessions, Plaintiff reported marked improvement in all areas of her mental health with medication." *Gordon v. Colvin*, 2016 WL 6088263, at *16 (D.D.C. 2016); *see* AR 16. During her routine consultations with Dr. Singh, Ms. Johnson repeatedly reported that the "meds [were] helpful," that she was "feeling calmer," her "mood [was] improving," and she was "sleeping better." AR 512. "[M]arked improvement described in Plaintiff's own reports to her psychiatrist . . . corroborated the determination that Plaintiff did not have a severe mental impairment." *Gordon*, 2016 WL 6088263, at *17.

*Third*, the ALJ correctly concluded based on substantial evidence "that [Ms. Johnson] does not have marked difficulties in daily living." *Meador v. Colvin*, 2015 WL 1477894, at *4 (W.D. Va. Mar. 27, 2015). Ms. Johnson was capable of "cooking, cleaning, and occasionally shopping for groceries and clothing." *Goodman*, 233 F. Supp. 3d at 112; *see, e.g.*, AR 294–95. state agency psychological consultant Heiser "found only mild restriction in activities of daily living." *Meador*, 2015 WL 1477894 at *4; *see* AR 145. Treatment records from Dr. Singh and the DC Department of Behavioral Health and Preventive Measures as well as examination records with Dr. Nolte showed that Ms. Johnson could "sleep, eat, . . . groom, and cooperate." *Meador*, 2015 WL 1477894 at *4; *see, e.g.*, AR 504–20.

### 2. *Proving "Marginal Adjustment"*

"'[M]arginal adjustment' means that [the claimant's] adaptation to the requirements of daily life [was] fragile." 20 C.F.R. Part. 404, Subpart. P, Appendix. 1, § 12.00(G)(2)(c). The ALJ "will consider that [the claimant] ha[d] achieved only marginal adjustment when the evidence

shows that changes or increased demands have led to exacerbation of [her] symptoms and signs and to deterioration in [her] functioning." *Id.*

*First*, Ms. Johnson was able "to function outside of [the] home or a more restrictive setting, without substantial psychosocial supports." *Id.* Yet, the listing requires otherwise to show marginal adjustment. *Id.* Ms. Johnson engaged in a wide range of social activities outside of her home almost on a daily basis, such as attending church, "us[ing] public transportation, . . . walking to the bus stop, . . . and [] shopping for groceries and clothing, among other things." *Goodman*, 233 F. Supp. 3d at 112. Mr. Curtis testified that Ms. Johnson regularly went outside, including on her own sometimes, and that the two of them "watch TV, walk in stores, go to church, visit family" on a weekly basis. AR 305–06. "[Ms. Johnson's] daily routine . . . belie[s] her claim that her symptoms are so disabling that she is unable to work." *Goodman*, 233 F. Supp. 3d at 112.

*Second*, Plaintiff never experienced any "episodes of deterioration that [] required [her] to be hospitalized," which is described by the listing as evidence of marginal adjustment. 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.00(G)(2)(c). Rather, she received relatively conservative psychological treatment and reported improvement with medication on multiple medical visits from June 2015 to December 2017. *See* AR 16, 112, 504–21, 619–45, 812–20, 835–926, 942–74. On May 18, 2015, Dr. Woods reported that Plaintiff had neutral mood, clear sensorium, and was "oriented to time, place, and person." AR 527–28. The listing also points to "repeated episodes of decompensation" as evidence of marginal adjustment. *Meador*, 2015 WL 1477894, at *5. Yet, Dr. Heiser concluded that Plaintiff did not have "repeated episodes of decompensation [] of extended duration." AR 145. While Plaintiff countered that she does not handle stress well and does not handle change well, the record again belies such conclusion. *See Goodman*, 233 F. Supp. 3d at 112.

14

Because Plaintiff only meets Paragraph A, but not Paragraphs B and C under § 12.06, the ALJ did not err in concluding that Ms. Johnson does not meet or medically equal the listing criteria for anxiety disorder.

B.    Step-Four Evaluation of Physical and Mental Limitations in Assessing RFC

The RFC must account for the claimant's exertional capacities (e.g., physical limitations) and non-exertional capacities (e.g., mental limitations).  *See Davis v. Berryhill*, 272 F. Supp. 3d 154, 171 (D.D.C. 2017) (citing Social Security Ruling ("SSR") 96–8P, 1996 WL 374184, at *5). The ALJ must assess the RFC on the record, which includes "all of the relevant medical and other evidence."  § 404.1545(a)(3).  In particular, the ALJ "will consider any statements about what [the claimant] can still do that have been provided by medical sources, whether or not they are based on formal medical examinations."  § 404.1545(a)(3).  The ALJ "will also consider descriptions and observations of [the claimant's] limitations from [her] impairment(s), including limitations that result from [her] symptoms . . . provided by [the claimant], [her] family, neighbors, friends, or other persons."  *Id.*

The RFC determination "must contain a 'narrative discussion' identifying the evidence that supports each conclusion."  *Butler*, 353 F.3d at 1000.  The ALJ's discussion must "build an accurate and logical bridge from the evidence to [the] conclusion so that . . . a reviewing court . . . may assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review."  *Lane-Rauth v. Barnhart*, 437 F. Supp. 2d 63, 67 (D.D.C. 2006).  But "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision."  *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005).  Failure to assess a specific piece of evidence constitutes error only if the ALJ failed to "develop the record fully and fairly."  *Charles v. Astrue*, 854 F. Supp. 2d 22, 30 (D.D.C. 2012).  Based on a review of the entire record, the ALJ must

indicate "what evidence was credited, [and] also whether other evidence was rejected rather than simply ignored." *Butler*, 353 F.3d at 1002.

### 1.   *Physical Limitations*

#### i.   Medical Records

The ALJ found that Plaintiff had physical limitations including "spine pain, wrist pain, decreased upper extremity range of motion, left upper extremity pain/paresthesia, weak grasp, left thenar atrophy, positive Tinel's sign, and/or left hand tenderness." AR 19. He refused to find greater physical limitations in Plaintiff's RFC, which he used in step five to determine jobs that Plaintiff could perform, for three reasons. *First*, Ms. Johnson "had a relatively conservative treatment history . . . [with] no evidence of surgical intervention throughout 2015, 2016, 2017, 2018." AR 19, 357–974. *Second*, "imaging studies of the cervical spine [showed] only 'mild' cervical spondylosis." AR 19, 589. *Third*, Plaintiff's examinations and reports with Drs. Williams and Gerald from January 2015 to December 2017 indicated that she "exhibited an intact musculoskeletal system with full range of motion." AR 19, 773–93, 809–10. The ALJ further observed that "neurological examinations on these dates . . . showed no bony tenderness of the back and the claimant was reported with no gait abnormality." AR 19.

The ALJ properly considered and explained the weight he gave to the medical evidence in the record. *See* AR 19–20. He assigned little weight to Dr. Williams' check-box evaluation on August 5, 2016, because such findings were "inconsistent with the full longitudinal record." AR 20. Courts have regularly discounted such clinical findings by "checking boxes without providing any additional explanation." *Page*, 2016 WL 9456343, at *15. The ALJ assigned partial weight to the findings of the state agency medical consultants because they were "somewhat inconsistent with one another" and were "not consistent with the treatment history and the combined effects of

multiple conditions." AR 20. "This Circuit considers a treating physician's opinions to be non-binding when they contain conclusions coupled with discrepant observations." *Turner v. Astrue*, 710 F. Supp. 2d 95, 107 (D.D.C. 2010). In particular, Dr. Bedeau's opinion that Ms. Johnson "[wa]s capable of a light RFC . . . [and] c[ould] perform handling and gross manipulations without difficulties" contradicts her conclusion that Plaintiff could only "lift and/or carry up to ten pounds." AR 147–48. Finally, the ALJ accorded little weight to the conclusions of Dr. Nolte because she "failed to provide clear and specific function-by-function limitations in many facets" and "had a limited opportunity to examine the claimant." AR 20. "[F]requency of examination" and "supportability" were appropriate factors in discounting Dr. Nolte's opinions. *Butler*, 353 F.3d at 1003 n.7 (citing 20 C.F.R. §§ 404.1527(d)(2)–(3)).

ii.      Third-Party Function Report

The ALJ properly accorded little weight to the third-party function report completed by Mr. Curtis in which he opined that Ms. Johnson had lifting and walking limitations. *See* AR 307–08. When considering evidence from a source "who ha[d] not seen the individual in a professional capacity in connection with their impairments, such as . . . friends . . . it would be appropriate to consider such factors as the nature and extent of the relationship, whether the evidence [wa]s consistent with other evidence, and any other factors that tend[ed] to support or refute the evidence." SSR 06-03P, 2006 WL 2329939, at *6. Information from non-medical sources, however, "cannot establish the existence of a medically determinable impairment. Instead, there must be evidence from an 'acceptable medical source' for this purpose." *Id.* at *2. The nature of this relationship here was intensely personal—a two-year romantic relationship—which naturally gives rise to bias. *See Nsiah v. Saul*, 2021 WL 372784, at *12 (D.D.C. 2021) (according little weight to "the third-party function report of Plaintiff's mother"). The ALJ "not[ed] the

contradictory [medical] evidence in the record," which showed Ms. Johnson could lift and walk contrary to Mr. Curtis' report.  *Butler*, 353 F.3d at 1002.  Additionally, Plaintiff's conservative treatment history, benign findings in her physical examinations, and Plaintiff's repeated statements about her improved symptoms, further justified the ALJ's discounting of Mr. Curtis' testimony. *See Nsiah*, 2021 WL 372784, at *12.

iii.     Medication Side Effects

An ALJ should "not find an individual disabled based on alleged symptoms alone."  SSR 16-3P, 2016 WL 1119029, at *4.  "[D]rowsiness often accompanies the taking of medication, and it should not be viewed as disabling unless the record references serious functional limitations." *Rutherford v. Barnhart*, 399 F.3d 546, 555 (3d Cir. 2005).

Substantial medical evidence supported the ALJ's decision to accord little weight to Plaintiff's subjective complaints that the drugs she took caused drowsiness, dizziness, and sadness. *See* AR 19–21.  Plaintiff's assertion was not substantiated by "evidence of any functional limitation."  *Rutherford*, 399 F.3d at 555.  For example, Plaintiff repeatedly denied side effects from her medications.  *See* AR 504–20, 621–44.  Moreover, Dr. Singh recorded that the medications stabilized Plaintiff's mood, improved her anxiety, helped her feel calmer and sleep better.  *See*, *e.g.*, AR 512.

2.    *Mental Limitations*

The ALJ found that Plaintiff had the following mental limitations in her RFC: "depression, anxiety, anhedonia, excessive energy, excessive worry, fatigue, panic attacks, feelings of hopelessness/abandonment, emptiness, flight of ideas, sleep problems, paranoia, psychomotor agitation, irritability, poor concentration, impaired recent/remote memory, and psychomotor retardation."  AR 20–21.  He declined to find greater mental limitations in Plaintiff's RFC, which

18

he used to determine jobs that Plaintiff could perform in step five, for three reasons. *First*, "[Plaintiff]'s psychiatric treatment history during the relevant period [was] relatively conservative with no evidence of prolonged inpatient psychiatric hospitalization of frequent emergency room visits due to psychiatric reasons." AR 21. *Second*, "during the relevant period, [Plaintiff] reported and/or was reported as experiencing improvement with medication." *Id. Third*, Plaintiff "reported and/or has been reported as engaging in activities that [we]re not consistent with the presence of greater mental limitations." AR 22.

The ALJ accorded significant weight to the findings and conclusions of the state agency psychiatric consultants, who opined that Plaintiff was able to remember and "carry out short, simple instructions on a regular basis;" and that "minimal public contact" would help "minimize symptoms." AR 22, 140–52, 154–172. The ALJ "was also justified in placing little weight" on the conclusions of Drs. Cottrell and Woods due to internal inconsistencies, the doctors' limited interaction with Plaintiff, and "conflicting evidence in the record." *Turner*, 710 F. Supp. 2d at 107; *see* AR 22–23. The ALJ also considered and accorded little weight to the Global Assessment of Functioning (GAF) because it was inconsistent with the entire record and essentially based on Plaintiff's subjective complaints. *See* AR 23–24. Moreover, "GAF scores have no direct correlation to the severity requirements of the mental disorders listings." *Williams v. Colvin*, 134 F. Supp. 3d 358, 365 (D.D.C. 2015) (internal quotation omitted).

The ALJ's evaluation of Plaintiff's physical and mental limitations in assessing her RFC was not missing "crucial particulars" or even "spare;" instead, the ALJ indicated "not only of what evidence was credited, but also whether other evidence was rejected." *Butler*, 353 F.3d at 1002.

C.     Step-Five Determination of Other Jobs That Ms. Johnson Could Perform

An ALJ may "base[] [his] conclusion [that jobs exist in significant numbers in the national economy] almost entirely on the testimony of the vocational expert." *Brown v. Barnhart*, 408 F. Supp. 2d 28, 33 (D.D.C. 2006).  The ALJ is not required "to submit to the vocational expert every impairment *alleged* by a claimant;" instead "the ALJ must accurately convey to the vocational expert all of a claimant's credibly established limitations." *Rutherford*, 399 F.3d at 554.  Often, a challenge to an ALJ's reliance on VE testimony at step five boils down to a challenge to the RFC assessment itself. *See id.* at n.8.  The VE testified that no jobs existed for someone with Plaintiff's limitations only if she also needed a cane to ambulate. *See* AR 136.  The ALJ properly discredited this limitation.

1.     *Weighing Treating Physician's Opinion*

"[T]he opinion of a treating physician is controlling . . . only if it is not inconsistent with other substantial record evidence and [it is] well-supported by medically acceptable clinical and laboratory diagnostic techniques." *Grant*, 857 F. Supp. 2d at 153 (internal quotations omitted). "To find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (*i.e.*, whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information)." SSR 96–9P, 1996 WL 374185, at *7.

The only medical opinion suggesting that Plaintiff needed a cane to ambulate is that of Dr. Williams.  He prescribed a cane at Ms. Johnson's request because she "fe[lt] like her balance [wa]s off." AR 541.  His prescription "lack[ed] the specificity necessary to determine whether this was the doctor's medical opinion or merely a restatement of what was told to him by [Ms. Johnson]."

*Tripp v. Astrue*, 489 F. App'x 951, 955 (7th Cir. 2012).   Dr. Williams failed to give "an unambiguous opinion . . . stating the circumstances in which an assistive device [wa]s medically necessary." *Id.*

On August 5, 2016, Dr. Williams gave a check-box opinion that Ms. Johnson needed an assistive device, which again stood alone without any written explanation. *See* AR 760. This form report "in which a physician's obligation [was] only to check a box or fill in a blank [is] weak evidence at best . . . [particularly when] unaccompanied by thorough written reports." *Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993). Moreover, Dr. Williams "offered an opinion without conducting any diagnostic tests, and has no expertise in orthopaedics." *Tripp*, 489 F. App'x at 955.

Furthermore, the ALJ "explain[ed] his reasons for [rejecting the opinion of a treating physician]" by citing substantial contradictory evidence, including medical examinations, imaging studies, and reports. *Williams v. Shalala*, 997 F.2d 1494, 1498 (D.D.C. 2004); *see* AR 19–20. For example, Dr. Nolte noted in an examination on August 21, 2015, that Plaintiff "appeared to be in no acute distress," had normal gait and stance, "used no assistive devices," "needed no help getting on and off exam table," and was "able to rise from chair without difficulty." AR 537. Plaintiff's cervical spine showed no abnormality; she did not have "cyanosis, clubbing or edema" in her extremities, and had "no muscle atrophy." AR 538–39. An examination on August 1, 2016, showed that Plaintiff had only "mild" cervical spinal pain with "[n]o evidence of acute fracture or subluxation." AR 19, 589. Examinations between January 2015 and December 2017, showed that Plaintiff exhibited an intact musculoskeletal system with full range of motion, had no bony tenderness of the back, and reported with no gait abnormality. *See*, *e.g.*, AR 19, 773–77.

2.      *Weighing Ms. Johnson's Testimony*

A claimant's "[s]tatements about . . . symptoms will not alone establish that [she was] disabled.  There must be objective medical evidence from an acceptable medical source that shows [she] ha[d] a medical impairment(s) which could reasonably be expected to produce the . . . symptoms alleged." 20 C.F.R. § 416.929.  Whenever the claimant's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the ALJ must make a credibility finding of the claimant's statements "based on a consideration of the entire case record."  SSR 96–7P, 1996 WL 374186, at *2.  The ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and reasons for that weight."  *Id.* at *2; *Butler*, 353 F.3d at 1005.

Plaintiff's subjective statements in June 2014 about dizziness were inconsistent with the objective medical record.  *See* AR 799.  On July 15, 2014, she underwent an MRI scan that showed "no significant intracranial abnormality."  AR 395, 403.  This confirmed the finding of Plaintiff's previous MRI scan on December 15, 2015, which also showed no abnormality.  Moreover, Plaintiff routinely denied dizziness in medical visits from 2014 to 2017.  *See* AR 357–63, 543–65, 763–810, 930–41.  She also did not complain about her medications' side effects, but rather that they alleviated her symptoms.  *See* AR 504–20, 621–44.

The ALJ properly weighed the medical opinion of Dr. Williams and Plaintiff's claims about her need for a cane and dizziness.  The ALJ did not err in excluding this limitation from his step-five analysis.

## IV.     RECOMMENDATION

For the foregoing reasons, the undersigned recommends that the Court DENY Plaintiff's Motion for Judgement of Reversal, and GRANT Defendant's Motion for Judgment of Affirmance.

## V.     REVIEW BY THE DISTRICT COURT

The parties are hereby advised that under the provisions of Local Rule 72.3(b) of the United States District Court for the District of Columbia, any party who objects to this Report and Recommendation must file a written objection thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation.  The written objections must specifically identify the portion of the report and/or recommendation to which objection is made, and the basis for such objections.  The parties are further advised that failure to file timely objections to the findings and recommendations set forth in this report may waive their right of appeal from an order of the District Court that adopts such findings and recommendation.  *See Thomas v. Arn*, 474 U.S. 140, 144–45 (1985).

Date: July 14, 2021

_____
ZIA M. FARUQUI
UNITED STATES MAGISTRATE JUDGE